UNITED STATES of America,
Plaintiff–Appellee,

v.

Louis Edward HENRY, Jr.,
Defendant–Appellant.

No. 88–5890.

United States Court of Appeals,
Sixth Circuit.

Argued April 14, 1989.

Decided July 3, 1989.

---

Joseph M. Whittle, U.S. Atty., Julie A. Brown, Asst. U.S. Atty. (argued), Louisville, Ky., for U.S.

G. Murray Turner (argued), Mulhall, Turner & Hoffman, Louisville, Ky., for Louis Edward, Jr.

Before JONES, WELLFORD and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Defendant, Louis Edward Henry, Jr., appeals from his criminal convictions for marijuana offenses. Specifically, Henry was convicted of manufacturing and possessing marijuana with the intent to distribute, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Since Henry was in possession of firearms at the time of his arrest, he was also charged and convicted of using a firearm during the commission of a drug trafficking crime. 18 U.S.C. § 924(c)(1).

Henry was sentenced to two one-year concurrent terms on the marijuana offenses and two consecutive five-year terms on the firearms counts. The five-year terms were also made consecutive to the concurrent one-year terms.

On appeal, Henry argues that the trial court made two errors as to jury instruc-

tions. He also claims that the evidence against him was obtained in violation of his fourth amendment rights, and that the two firearms counts should have been merged as they constitute only one offense.

Upon review, we find the questions raised as to jury instructions to be wholly without merit. We also conclude that no violation of defendant's fourth amendment rights occurred. However, we find merit to defendant's arguments on the firearms counts, and conclude that only one offense was committed. We discuss these issues *seriatim*.

## I.

On September 21, 1987, at 3:30 a.m., an anonymous tipster telephoned the Jefferson County, Kentucky, Police Department, and indicated that a marijuana field was in the process of being harvested on property which was later determined to be owned by defendant Henry.[1] Pursuant to the call, Sgt. Douglas Hawkins met with the tipster and they travelled together to where the harvesting was occurring. Upon arriving at the scene, Hawkins observed three flashlights moving about in a manner that confirmed a harvesting operation was in progress. Hawkins then called for backup and a helicopter to illuminate the area. Three backup units and the helicopter arrived at about the same time. Since the helicopter pilot was only aware of the general area where the activity was occurring, he turned on his lights too soon and the three suspects fled. The police officers then returned to their vehicles and proceeded up a road leading into the property in the direction the suspects had fled. Upon reaching a locked gate, the officers, all of whom were uniformed, left their cars and proceeded on foot. They observed a farmhouse, an outbuilding, and a circular driveway on which two vehicles were parked. The vehicles were dew covered and the officers could not see inside. Officer James Gray approached one of the vehicles, a Ford Torino, while the other officers

stayed back. Gray thought he saw a person or persons in the front seat. He loudly identified himself and ordered the occupants out. When no one exited, Gray approached the car and opened the driver's door. He saw two persons crouched down in the front seat. Gray ordered the driver and passenger to get out. Gray started to pat down the driver when he heard Hawkins shouting that the passenger, who turned out to be defendant Henry, had a gun. Henry, apparently realizing for the first time that other officers were present, dropped the gun as ordered by Hawkins.

Having seen Henry emerge not only armed but also in a manner suggesting he might use the weapon, the officers were concerned about the location of the third individual who had fled the harvesting operation. Gray checked the other vehicle, a pickup truck, and found what appeared to be a bag of marijuana in plain view, but no occupants. Gray then looked up at the farmhouse, which appeared to be in the process of being remodeled, and saw that the front door was ajar eight to ten inches. Gray carefully opened the door, shined his flashlight inside, and observed a large marijuana plant hanging upside down from an exposed rafter in the kitchen. At this point, Gray returned to his vehicle and the narcotics unit was summoned. The narcotics unit responded with a search warrant.

Upon execution of the search warrant, a large amount of freshly cut marijuana was found in the house. One thousand forty-one dollars ($1,041) was confiscated from Henry's person at the time of the arrest along with $2,100 found in a cigar box in the living room. A .22 caliber Beretta pistol was located in close proximity to the cash. Thirty mature marijuana plants were found growing behind the garage, a short distance from the house. The plants were tied over with ropes and staked to the ground. The area was encircled with ropes, trip wires, and bells. An intercom system was hooked up between the garage and the house which broadcast sounds in

---

**1.** The tipster said he had just recently been dove hunting in this field and noticed marijuana scat-

tered about.

the garage area into the house. Inside the house, next to a window which looked out upon the plants growing behind the garage, a pair of binoculars was found. Next to the window was a bathtub containing three large baggies, each containing over a pound of cured processed marijuana. Close to the window was a loaded .30 caliber rifle. Two books on growing marijuana were also seized.

Henry and the other occupant of the car, Frank Morgan, Jr., were subsequently indicted. Henry testified at trial and, on the basis of his exculpatory testimony as to his codefendant, Morgan was acquitted. The jury found the rest of Henry's testimony less convincing, however. Henry testified that the marijuana plants had grown wild, and that he merely harvested them for his own personal use. As to the weapons, Henry maintained he was merely exercising his Constitutional right to keep and bear arms, stating that he carried a loaded firearm with him at all times on the premises due to his concern about "prowlers." With regard to the rifle, Henry testified he used it on occasion to "shoot groundhogs." Henry further testified he found the bagged processed marijuana in a farm outbuilding, that it appeared moldy to him, and he thought he might use it for "mulch."

## II.

### The Jury Instructions Issue

■ During deliberations, the jury sent out a note requesting "the written charges ... the judge's instructions ... [and] more coffee." (Transcript at 484–85). The court brought in the jury and the following colloquy took place:

THE COURT: Have a seat. Now, ladies and gentlemen, you sent us some more questions. We will get you another pot of coffee. You've asked for the written charges. I assume by that you mean you want a copy of the indictment which we will furnish you. You have also asked for a hard copy of the court's instructions. Is there a specific instruction that you want? Who is your foreman?

JURY FOREPERSON: Yes, sir.

THE COURT: Is there a specific instruction that you want?

A JUROR: Were you reading them from the pages?

THE COURT: I was reading some that I had prepared myself, some that are Xerox copies of the standard charges.

A JUROR: Just the Xerox copies would be fine, I suppose.

THE COURT: Now, let me go through here. The preliminary instructions, the ones dealing with your obligations and what your responsibilities are, the matter of the consideration of evidence, do you want all of that?

JURY FOREPERSON: Please.

A JUROR: Relative to the charges.

THE COURT: I get the impression that [all you] really want are the substantive charges, that is, what the elements of the crime are, what the government must prove beyond a reasonable doubt?

A JUROR: Yeah.

THE COURT: All right. I'll go through here and pull these out.

(Transcript at 485–86).

Defense counsel objected to less than the full set of instructions being sent in and also asked that the jury be readmonished that the indictment is not evidence. The court overruled the objection as to less than the full set of instructions going to the jury but did repeat the entire instruction relating to the indictment not being evidence of guilt.

Although the discussion that occurred between the court and members of the jury is less than completely illuminating as to just what the jury wanted, we cannot conclude that the court was unresponsive to the jury's request. As to the court's decision to send in only the instructions relating to the substantive counts, we find this to be a proper exercise of the court's discretion. *United States v. Acosta*, 763 F.2d 671, 677 (5th Cir.), *cert. denied*, 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985).

■ Henry also argues that the court erred in the instruction it gave to the jury relative to the lesser included offense of possession of marijuana. The court's instruction was as follows:

> The essential elements which the government must prove beyond a reasonable doubt to establish the guilt of the defendants or either of them under Count 2 of the indictment are, first, that the defendants knowingly and intentionally possessed a controlled substance, and second, that the defendants or either of them possessed the substance with the intent to distribute it.
>
> If the jury finds the defendants or either of them not guilty under this instruction, you should then proceed to determine the guilt or innocence of the accused as to the lesser included offense of possession of a controlled substance. In order to find the defendants or either of them guilty of the lesser included offense of possession of a controlled substance, the jury must find beyond a reasonable doubt that the defendants or either of them knowingly and intentionally possessed a controlled substance as charged in the indictment.

(Transcript at 466–67). Defendant argues that the last five words of the instruction, "as charged in the indictment," refers the jury back to the charge of possession with intent to distribute. We find this a strained construction. In context, it is clear that what is referenced is possession of a controlled substance, which *substance* is charged in the indictment. The court had previously instructed on possession with intent to distribute and then instructed the jury on the lesser included offense of possession. We see no room for confusion, particularly when the court immediately followed the lesser included possession charge with an explanation of simple possession, both constructive and actual. Given the quantity of marijuana found in the house and growing on the premises and defendant's weak explanation for its presence, the jury had more than ample evidence from which to conclude that the possession was with intent to distribute.

### III.

### The Fourth Amendment Issue

Although a search warrant was ultimately obtained, the initial entry on the premises was warrantless. It was during this warrantless entry that the probable cause was established for the search warrant. Thus, if the initial entry was in violation of the fourth amendment, the search warrant would be fatally defective. The district judge found the warrantless search to be justified by exigent circumstances. *United States v. Renfro*, 620 F.2d 569, 574–75 (6th Cir.), *cert. denied*, 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980). We agree.

■ Defendant, in claiming a fourth amendment violation, first constructs an argument based upon the original tip coming from an unknown informant. Here, however, the officer met with the tipster in person and went to the alleged crime scene where he personally observed what appeared to be the harvesting of the marijuana. Under such circumstances, the reliability of the informant is not implicated. *United States v. Roberts*, 747 F.2d 537, 544 (9th Cir.1984).

■ Next, defendant argues that the officers had no legitimate fear of destruction of evidence or escape of suspects that would justify proceeding without a warrant. We find this argument untenable. It was the middle of the night and out in open country. The officers had never been on the property before and did not know what methods or means of ingress or egress were available. The suspects ran when the helicopter came, justifying the officers proceeding in the direction they thought would lead them to the suspects. Officer Hawkins had been told by the informant that the informant knew marijuana was being grown and that a harvest was in progress. Given what the officers knew about marijuana being grown in the Jefferson County area and what they themselves observed, they had probable cause to believe a drug offense was being committed in their presence and, if they stopped to get a warrant, the suspects would escape.

*United States v. Birmley,* 529 F.2d 103, 106 (6th Cir.1976).

The fact that their immediate pursuit of the suspects only turned up two of them when they had seen three, coupled with the armed exit from the car by defendant, gave the officers both probable cause and the necessary exigent circumstances to look further in the immediate area. The marijuana found in the pickup truck and the open house door added to the justification for looking into the house. When the officer saw the marijuana in plain view in the house, he alerted the narcotics officers who secured a search warrant and completed the search. We find nothing in this scenario other than prudent police work, and find no fourth amendment violation.

## IV.

### The 18 U.S.C. § 924(c)(1) Offenses

The government charged Henry with two section 924(c)(1) offenses: one related to the hand gun he was holding when he emerged from the auto, and the other related to the two firearms found in the house. Henry argues that "[i]t was unreasonable for the trial court to hold that two separate offenses were committed. At worse [sic], there was only one 'use' involved. It is the 'use' that violates the statute, not the number of weapons." The government responds that "[t]he facts of the instant case indicate separate acts of using and carrying firearms." Although the parties correctly suggest that this is an issue of first impression in this circuit, it is an issue that has been discussed by other circuits. Unfortunately, the parties neither cite nor discuss any of the current relevant case law.

 The current language of section 924(c)(1) was added to the statute by amendment in 1986. Prior to 1984, the statute had provided that it was a crime to carry a firearm "during the commission of any felony...." 18 U.S.C. § 924(c)(2) (effective 1968). In 1984, this language was changed to require that the predicate offense be "any crime of violence" instead of "any felony." The 1986 amendment added "drug trafficking crime" to the "any crime of violence" language. The statute now reads, in relevant part:

> Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

18 U.S.C. § 924(c)(1).

Here, Henry was convicted of two separate drug trafficking crimes, i.e., manufacturing and possession with intent to distribute. We agree with those courts which have held under such circumstances that each separate offense *may* be a predicate for a separate section 924(c)(1) firearms charge. *See, e.g., United States v. Jim,* 865 F.2d 211 (9th Cir.1989) (defendant in same escapade shot at three different federal officers and was convicted of three counts of assault on a federal officer and three counts of using a firearm during a crime of violence);[2] *United States v. Fontanilla,* 849 F.2d 1257 (9th Cir.1988) (because murder of one person and assault of another in same episode were properly charged as separate crimes, it was permissible to charge defendant with two separate section 924(c)(1) counts); *United States v. Chalan,* 812 F.2d 1302 (10th Cir. 1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988) (under section 924(c), multiple firearms counts were proper if the underlying multiple offenses do not constitute a "single offense" for double jeopardy purposes).[3]

Thus, contrary to defendant's contentions, the two section 924(c)(1) counts should not have been merged. However, this is because two separate predicate offenses were charged, not, as the government suggests, because more than one gun was involved.

---

**2.** Section 924(c)(1) "crime of violence" cases would be an analogue for "drug trafficking crime" cases since the applicable statute makes no distinction between the two.

**3.** *Chalan* is a pre–1986 amendment case but the principle is the same.

■ Notwithstanding that under the facts and circumstances presented here the government might have successfully charged defendant with two section 924(c)(1) counts, we find it necessary to vacate the conviction under count three. In order to understand our reasoning, it is necessary to look at the manner in which the government worded the indictment, and also those cases discussing a section 924(c)(1) charge where the predicate offense is possession with intent to distribute.

Counts three and four of the indictment read as follows:

### COUNT 3

On or about the 21st day of September, 1987, in the Western District of Kentucky, Jefferson County, Kentucky, LOUIS EDWARD HENRY, JR., during and in relation to a drug trafficking crime, to-wit, manufacturing and possessing with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(a)(1), did use and carry a Model 59, Smith & Wesson 9 mm. semi-automatic pistol, bearing serial number A6022721.

In violation of Title 18, United States Code, Section 924(c)(1).

### COUNT 4

On or about the 21st day of September, 1987, in the Western District of Kentucky, Jefferson County, Kentucky, LOUIS EDWARD HENRY, JR., during and in relation to a drug trafficking crime, to-wit, manufacturing and possessing with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(a)(1), did use and carry two (2) firearms, to-wit, a .30 caliber U.S. carbine rifle, serial number unknown, and a .22 caliber semi-automatic Beretta pistol, bearing serial number 8AS04453U.

In violation of Title 18, United States Code, Section 924(c)(1).

■ It can be seen that rather than linking one of the firearms counts specifically to one of the drug counts, the government here referenced both drug counts in *each* of the two firearms counts. This is a further illustration of the government's misapprehension that it is the number of guns involved that controls. In this regard, we note that the issue of whether a narcotics *possession* charge will even support a section 924(c)(1) violation is not without controversy. This issue has been raised in several cases due to the wording of section 924(c)(2), which defines "drug trafficking crime" as "any felony violation of Federal law involving the *distribution, manufacture,* or *importation* of any controlled substance...." (Emphasis added). However, the argument that the definition only mentions "distribution," "manufacture," and "importation," and that "possession" offenses are thus excluded, has been universally rejected by the courts which have considered it. *United States v. Torres,* 862 F.2d 1025, 1030 (3rd Cir.1988); *United States v. Robinson,* 857 F.2d 1006, 1010 (5th Cir.1988); *United States v. Matra,* 841 F.2d 837, 843 (8th Cir.1988); *United States v. James,* 834 F.2d 92, 93 (4th Cir.1987). We join with those courts which have concluded that "possession with intent to distribute" is a "drug trafficking crime" within the meaning of section 924(c)(2).[4]

However, since "possession" can be constructive as well as actual, and thus may be wholly passive conduct, the question of the relationship of the firearm to the "possession" becomes material. Section 924(c)(1) requires that the firearm be used or carried "during and in relation" to a drug trafficking offense.[5]

---

4. After the trial of this case, section 924(c)(2) was amended and now reads: "[T]he term 'drug trafficking crime' means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.)...." Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 6211, 102 Stat. 4360. Thus the issue of "possession" crimes has been resolved by Congress.

5. The legislative history of the 1984 amendment to section 924(c) indicates that the "in relation to" element will be satisfied "if from the circumstances or otherwise it could be found that the defendant intended to use the gun if a contingency arose or to make his escape." S.Rep. No. 225, 98th Cong., 2d Sess. 1, 314, n. 10 (1983),

■ In cases involving firearms found on premises under the control of a drug offense offender, the courts have developed a "fortress analogy" theory, which holds that if it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction, then such firearms are used "during and in relation to" a drug trafficking crime. *Matra*, 841 F.2d at 843; *United States v. LaGuardia*, 774 F.2d 317, 321 (8th Cir.1985).

Applying the "fortress" theory to this case, we conclude that the rifle and handgun found in the house clearly bear the type of relationship discussed in *Matra* to either or both the "possession" or "manufacturing" offenses. *Robinson* also followed *Matra* under circumstances where seven firearms were found in various locations in defendant's house along with cocaine and marijuana. *Robinson*, 857 F.2d at 1010.

■ As to the gun that defendant brandished when alighting from the car, we conclude that it was also part of the "fortress" arsenal. At the time of his arrest, the defendant did not have drugs on his person, nor was he engaged in a narcotics transaction. He was protecting his supply of marijuana, however.[6] Thus, we consider this weapon to bear the same relationship to drug trafficking crimes as did the weapons in the house. As stated earlier, this conclusion is buttressed by the government referencing both the manufacturing and possession charges in count four of the indictment and failing to distinguish between count three and count four other than to charge that different weapons were involved.

Our conclusion that the count three conviction must be vacated avoids the necessity of our discussing two other issues. In the recent case of *Torres*, the court, by implication at least,[7] concluded relative to multiple section 924(c)(1) offenses that "the law allows separate and discrete offenses to be charged, [but] does not permit separate and discrete sentences to be imposed...." 862 F.2d at 1032. We leave for another day the question of whether we agree with *Torres*.

Also, at least two cases have found fatal flaws in cases where the government has charged section 924(c)(1) offenses relating to weapons found on the premises of a drug trafficker. In *United States v. Feliz–Cordero*, 859 F.2d 250 (2d Cir.1988), the court concluded that a handgun found in a dresser drawer located on the premises from which the agents also seized cocaine and related paraphernalia could not be used as the basis for a section 924(c)(1) charge. The Second Circuit set forth a two-part test:

> [I]n order for possession of a firearm to come within the "uses" provision of section 924(c), one of the following is required: i) Proof of a transaction in which the circumstances surrounding the presence of a firearm suggest that the possessor of the firearm intended to have it available for possible use during the transaction; or ii) The circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available for use during such a transaction.

859 F.2d at 254.

Applying this test to the the facts, the court concluded:

> In the present case, the presence of a firearm in a dresser drawer does not meet either of the requirements set out above. On the evidence presented, there

---

*reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3492 n. 10.

6. He was also arguably protecting his person or assaulting a local police officer. The former does not implicate section 924(c)(1), and the latter, although arguably a "crime of violence," was not charged.

7. We say by implication because, in *Torres*, the government stipulated on appeal that only one sentence may be imposed. It would appear that this is a matter on which the Department of Justice should develop a policy statement to guide United States Attorneys, if it has not already done so.

is no basis to conclude that the gun would have been quickly accessible if needed. Rather, under the circumstances of this case, the intent to use the firearm must be presumed from the fact that a loaded gun was found in the same room as drug paraphernalia during the course of a search pursuant to a warrant. This is not sufficient evidence to sustain a conviction, even in light of our recognition of the frequent connection between firearms and narcotics trafficking.

*Id.*

Similarly, in *United States v. Theodoropoulos,* 866 F.2d 587 (3d Cir.1989), the government advanced its "drug fortress" theory as to four firearms uncovered during the execution of a drug search warrant. Of the four guns, one, a shotgun, was found loaded inside the apartment while three handguns were found in a trash can on the adjacent porch. Applying the Second Circuit's two-part *Feliz–Cordero* test, the Third Circuit concluded that only the shotgun would bottom a section 924(c)(1) charge. Furthermore, since the government had included all four weapons in the firearms count, the court found it necessary to conclude:

> Because the weapons found in the trash can on the porch did not satisfy the requirement of section 924(c), and we cannot exclude the possibility that the jury convicted Trelopoulos solely on the basis of one or more of the weapons found on the porch, we will vacate his conviction on count 35.

*Theodoropoulos,* 866 F.2d at 598.

The case at bar is distinguishable from both *Feliz–Cordero* and *Theodoropoulos* in that the firearm charged in count three of the indictment was being carried by the defendant. However, even as to carried weapons, "the requirement that the firearm's use or possession be 'in relation to' the crime would preclude its application in a situation where its presence played no part in the crime, such as a gun carried in a pocket and never displayed or referred to in the course of a pugilistic barroom fight." S.Rep. No. 225, 98th Cong., 2d Sess. 314 n.

10 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3492 n. 10.

Even though the firearm charged in count three had a more direct relationship to the defendant, its relationship to a drug trafficking crime was less clear. Again, we emphasize, however, that had the government in count three related the firearm to a drug offense different than the ones charged in count four, we would have been able to affirm Henry's conviction under both counts.

AFFIRMED except as to the count three conviction which is VACATED. The case is REMANDED for resentencing.