**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James E. BRONAUGH,**
**Defendant–Appellant.**

**No. 89–3510.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 14, 1989.

Decided Jan. 23, 1990.

Thomas Bauer, Asst. U.S. Atty. (argued), Akron, Ohio, for plaintiff-appellee.

Gordon S. Friedman (argued), Friedman, Gilbert & Berezin, Cleveland, Ohio, for defendant-appellant.

Before WELLFORD and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

Under 18 U.S.C. § 924(a), the crime of making a false statement to procure a firearm is punishable by imprisonment for up to five years. Under the sentencing guidelines, however, if no related offense is involved, the crime is normally punishable by a sentence in the range of four to twenty-seven months, depending on the defendant's criminal history.

Defendant James E. Bronaugh pleaded guilty to a single charge of procuring a firearm through a false statement. Mr. Bronaugh's criminal history was such that the sentence range indicated by the guidelines ordinarily would have been imprisonment for six to twelve months. The sentence imposed by the district court was five years. The reason for this was that the court found, by a preponderance of the evidence, that Bronaugh had used the firearm in drug trafficking—and § 2K2.1(c)(1) * of the guidelines tells the court that "[i]f the defendant used the firearm in committing or attempting another offense," the court is to "apply the guideline in respect to such other offense...." The guideline range in respect to drug trafficking exceeds five years.

On appeal, defendant Bronaugh contends that there was insufficient evidence to show that he used the firearm in drug trafficking. We disagree, and we shall affirm the sentence.

Mr. Bronaugh, a resident of Michigan, admittedly arranged to have an Ohio resident named Robert Gibson purchase a .45 L.A.R. Grizzly pistol for him in Ohio without informing the firearms dealer that Bronaugh was the real buyer. In so doing,

Mr. Bronaugh admittedly violated the federal firearms laws.

The illegal purchase (which involved another handgun as well) was made on October 12, 1988, at "Sam's Emporium" on East Exchange Street in Akron, Ohio. Seven days after the purchase of the weapon, Mr. Bronaugh was arrested at Detroit Metropolitan Airport in possession of 448 grams of crack cocaine. Apparently he was not armed at the time of his arrest.

In a statement given to federal authorities on November 21, 1988, less than six weeks after the purchase of the gun, Mr. Gibson said that on October 12 he and a sometime girlfriend, Pam Hamilton, went to Sam's gun store with Defendant Bronaugh. Bronaugh and Gibson both entered the store, while Pam Hamilton remained in a car outside. As summarized in the presentence report, Mr. Gibson's statement continued as follows:

"Gibson related that the defendant picked out two guns and then produced $1,100 in cash while he, Gibson, filled out the firearm transaction forms. * * * Gibson told agents that the defendant chose both weapons and provided the money for both weapons. According to Gibson, they all went to Pam's house at 1045 Biruta Avenue, with the guns, and ... the defendant told Gibson that he did not have any money left to pay him $150; that he would pay him later. Gibson told agents that he had not seen the defendant ... or the guns since that day."

The clerk who handled the October 12 transaction at Sam's store subsequently confirmed that Defendant Bronaugh had been in the store with Gibson, and that Gibson had signed as the purchaser of the weapons. Ms. Hamilton also confirmed Gibson's account of the purchase, as the presentence report notes in describing an interview that federal agents had with Ms. Hamilton on November 28, 1988. Ms. Hamilton also told agents that Bronaugh had used her residence at 1045 Biruta Avenue as a place to sell cocaine, and that she

---

* Effective November 1, 1989, § 2K2.1(c)(1) was renumbered (with an inconsequential change in language) as § 2K2.1(c)(2).

had seen Bronaugh and a fellow drug dealer with four weapons, including an Uzi and an AKS rifle, as early as June of 1988. There is no reason to believe that Ms. Hamilton was not in continuous residence at 1045 Biruta Avenue from June through at least October 12, 1988.

Defendant Bronaugh was interviewed by a federal agent on April 6, 1989, shortly after Bronaugh pleaded guilty to the illegal purchase of the .45 L.A.R. Grizzly pistol. In the course of the interview, according to the presentence report,

> "defendant advised that agent that he [i.e., Defendant Bronaugh] had hidden the .45–caliber pistol in Akron and would surrender the weapon only if he was allowed to accompany the agent to the place. Otherwise he would not disclose the location of the weapon."

The gun was never recovered.

A sentencing hearing was held before the district court on May 22, 1989. The court had the benefit of the presentence report, of course, and the report was supplemented by live testimony from Ms. Hamilton, Mr. Gibson, and two other witnesses.

Taken together, the presentence report and the live testimony leave no room for doubt that Defendant Bronaugh and his confederates were operating an extensive retail cocaine business out of Ms. Hamilton's home at 1045 Biruta Avenue. The place was open for business 24 hours a day, and in the course of a single hour there might be as many as 15 to 20 customers. One customer, a friend of Ms. Hamilton's named Debra Thurmon, testified that there was "[t]raffic enough so you could make about five [thousand] or $6,000 [a day]." Ms. Hamilton testified that Bronaugh was bringing the drugs from Detroit, and on one occasion she herself had helped one of Bronaugh's associates carry drugs to Toledo from Detroit.

Ms. Thurmon, Ms. Hamilton, and Mr. Gibson all testified to having seen Defendant Bronaugh at the crack house with firearms. Two big guns, including the Uzi, were kept there in a duffel bag, according to Ms. Hamilton, "and it was like three or four hand guns that always laid around." When asked what kind of guns she had seen Mr. Bronaugh carry, Ms. Hamilton answered that "[h]e would have like maybe a .45 and the Uzi...."

Mr. Gibson, a narcotics user himself, testified that he had seen about three guns in the house, including a .38 semi-automatic rifle and a couple of handguns. On cross-examination, Mr. Gibson testified that the only weapon he actually saw Mr. Bronaugh with was the rifle.

The district court did not interpret Mr. Gibson's testimony as a repudiation of what Gibson had previously told the agents about buying two handguns for Mr. Bronaugh on October 12 and going with Bronaugh and Ms. Hamilton to the latter's house with the guns. (In another part of the cross-examination, after defense counsel had reminded Gibson of the statement he had given the authorities in November, Gibson confirmed that he had said then that he never saw Bronaugh after the purchase of the handguns on October 12. Counsel had every opportunity to show that the earlier report of what happened on October 12 was inaccurate, but counsel did not allude to the report further and made no direct attempt to discredit it.)

The district court was obviously satisfied with the accuracy of Mr. Gibson's November 21 statement about the two men and Ms. Hamilton all going to the crack house at 1045 Biruta Avenue with the illegally purchased guns. At the conclusion of the testimony, the court made the following findings:

> "The Court finds that the government has established by the preponderance of the evidence that the defendant did use the firearm obtained as described in the indictment in his ongoing operation with others of a house where cocaine powder and cocaine crystals ... commonly referred to as cocaine crack were being sold...."

The inference that the illegally purchased .45 caliber handgun described in the indictment did in fact go into the crack house is important, and Mr. Bronaugh's counsel was specifically asked about it dur-

ing the argument of this appeal. Without conceding that the presence of the handgun in the crack house meant that the gun was "used" in any drug transaction, counsel acknowledged—quite properly, in our view—that it would be fair to infer that the gun went into the house. "We have to infer," counsel said, "that it went into the house."

It may be instructive for us to quote the colloquy:

"COUNSEL: The only testimony we have by Gibson is that they dropped the folks off at 1045—

JUDGE: With the gun?

COUNSEL: With the gun. Yes, sir. I mean, they dropped—

JUDGE: So the gun went into the house?

COUNSEL: Well, we don't have actual evidence that they went into the house. I don't mean to pick here, but I mean they dropped—

JUDGE: Where else would it have gone?

COUNSEL: I'm sorry, your Honor.

JUDGE: Where else would it have gone?

COUNSEL: We have to infer that it went into the house. That's the only thing we have there is inference, and I don't believe that the government during the course of the hearing proved by a preponderance of the evidence that it was used in the drug transaction."

Trial courts, when they act as finders of fact, draw inferences all the time. In this instance, we believe, it was perfectly reasonable for the trial court to draw the same inference that Defendant Bronaugh's own lawyer did: the .45 L.A.R. Grizzly pistol that Mr. Bronaugh had purchased illegally went into the crack house at 1045 Biruta Avenue with Mr. Bronaugh when Mr. Gibson dropped him and Ms. Hamilton off there on October 12, 1988. There was no place else for the gun to go.

The burden was not upon the government to show at the sentencing hearing that Defendant Bronaugh went to the crack house at 1045 Biruta Avenue with the particular weapon that was the subject of the indictment, because that fact was clearly stated in the presentence report and the defendant never challenged it. The presentence report had to be disclosed to the defendant and his counsel at least ten days before the date set for sentencing, see 18 U.S.C. § 3553(d), and no one denies that proper disclosure was made in this instance. The defendant and his counsel were afforded an opportunity to comment on the report, as required by Rule 32, Fed. R.Crim.P., and at no point did they allege that the report was factually inaccurate in this respect. Mr. Gibson, the source of the information about the defendant's having gone to the crack house with the gun, was actually made available for cross-examination—and Mr. Bronaugh's able counsel chose not to question him about the truthfulness of his statement that Bronaugh had gone to the house with the gun. The fact stands unimpeached.

It is true that that trial judge did not give the parties advance notice that he would interpret the facts set forth in the presentence report as meaning that Bronaugh had taken the .45 L.A.R. Grizzly with him into the crack house when everyone went there after the illegal purchase. But as this court said in *United States v. Ford*, 889 F.2d 1570, 1572 (6th Cir.1989), "we do not believe [Rule 32] requires a judge in all cases to give the parties advance notice of and a chance to comment on the judge's interpretation of the facts." We do not believe that there was any such requirement here, the judge having made the only interpretation of the facts that would be reasonable.

In computing the guideline offense level for the crime to which Mr. Bronaugh pleaded guilty, the probation department proceeded on the understanding that the firearm described in the indictment "was to be used to protect drug trafficking activities." The inference that the gun was so used was accepted by the district court, as we have seen. Taking certain aggravating factors into account, the court determined that the offense level for trafficking in 448 grams of cocaine indicated a sentence in the range of 262 to 327 months. Applying that guideline, as instructed by

§ 2K2.1(c)(1), but not going above the statutory maximum for the weapons offense of which the defendant had been convicted, the court imposed a sentence of 60 months. A sentence shorter than 60 months, the court said, would represent an unwarranted downward departure from the guidelines.

Mr. Bronaugh argues on appeal that the district court committed clear error in finding that the .45 caliber Grizzly pistol was used in committing a drug trafficking offense. Inviting us to draw an analogy to cases decided under 18 U.S.C. § 924(c), which creates additional criminal liability for one who, "during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm," he argues that those cases require a tighter nexus between the firearm and the related offense than is present here.

In *United States v. Henry*, 878 F.2d 937 (6th Cir.1989), however, we adopted the "drug fortress" theory,

> "which holds that if it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction, then such firearms are used 'during and in relation to' a drug trafficking crime."

878 F.2d at 944. See also *United States v. Acosta–Cazares*, 878 F.2d 945, 951 (6th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989), where we held that " 'uses' and 'carries' should be construed broadly to cover the gamut of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions."

Mr. Bronaugh seeks to distinguish the line of cases leading to *Henry* and *Acosta–Cazares* by noting that in the case at bar no gun was ever found. This distinction is unavailing. By pleading guilty, Bronaugh admitted that the gun existed. The gun was clearly in the drug house, and there was a wealth of testimony showing that it was not the only weapon Bronaugh had there. The district court had ample

grounds for finding that these weapons— including the Grizzly, which was purchased only seven days before Bronaugh was arrested in possession of 448 grams of cocaine—were used in the drug business.

It may be thought anomalous that a defendant can receive a five-fold increase in his sentence because a preponderance of the evidence indicates he is guilty of an uncharged crime. But such increases are possible, under the guidelines, not only where the other crime is uncharged, but where the other crime does not even come within the jurisdiction of the federal courts. As the commentary to § 2K2.1 notes,

> "The firearm statutes often are used as a device to enable the federal court to exercise jurisdiction over offenses that otherwise could be prosecuted only under state law. For example, a convicted felon may be prosecuted for possessing a firearm if he used the firearm to rob a gasoline station. Such prosecutions result in high sentences because of the true nature of the underlying conduct. The cross reference at § 2K2.1(c) deals with such cases."

The piggy-back philosophy reflected in this comment, like the similar philosophy reflected in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, is a controversial one. The controversy, however, turns on congressional judgments that are not subject to amendment by the judiciary.

It is also important to note that the guidelines cannot result in the imposition of a sentence outside a range set by statute. Whatever the sentence to which defendant Bronaugh would have been subjected had he been convicted of drug trafficking, the sentence he actually received did not exceed the maximum that Congress thought would be appropriate for the weapons offense of which he was convicted. Before the advent of guideline sentencing, there could have been no doubt of the authority of the district court to impose a five-year sentence for the weapons offense. The imposition of a five-year sentence under the guidelines is certainly no more anomalous than the imposition of the same

sentence would have been in the pre-guideline era.

The sentence is AFFIRMED.

WELLFORD, Circuit Judge, dissenting:

Defendant Bronaugh, now twenty years of age, pleaded guilty to a single charge only of procuring a particular firearm by making a false statement and causing a "straw man" purchase of the .45 L.A.R. Grizzly pistol on October 2, 1988. The probation officer gave information in a presentence report that within a week after the indictment episode, defendant was arrested at the Detroit airport for possession of crack cocaine.[1] At a sentencing hearing, there was evidence that defendant had participated with others in extensive trafficking in cocaine at a crack house location in Akron, Ohio, during the summer and early fall of 1988, and that there were weapons seen in that house. Defendant had two prior juvenile adjudications. The available records did not indicate whether Bronaugh was represented by an attorney in the juvenile proceedings, but he was placed in foster care and ordered to make restitution in respect to those charges.

The district court found that the government established that "the defendant did *use* the firearm obtained as described in the indictment in his ongoing operation with others of a house where cocaine powder and cocaine crystals were found." (Emphasis added). It determined that "the provisions of 2K2.1(c)(1) do apply."[2]

The testimony of the witnesses at the sentencing hearing related to drug activity, in which defendant was involved, that likely occurred *prior* to the indictment offense in question in the summer of 1988. Pam Hamilton testified that in the period of time when she was present there (she was in a drug rehabilitation center and in a hospital during much of October and November 1988), she had seen people, including defendant, in the house in question with guns. ("I guess it was like .45s, the Uzi.") The United States Attorney, at the hearing, conceded "she did not identify the weapon as a .45 caliber, however."

Gibson, the "straw man" involved in the weapon purchase, was vague and ambivalent about times and dates. He testified as follows at the hearing, after admitting that he told a government agent he had "never seen Bronaugh after" going to purchase the guns on October 12:

A. It was after that. I didn't see—me and Pam broke up and I moved out of town and I haven't seen Pam nor J [defendant] after that.

Q. That was in November of '88?

A. I guess.

Q. So your testimony is that you saw him every day after June, sometime in June through October; is that correct?

A. Yes.

Q. Did you actually see cocaine on his person, in his hands?

A. Yes.

Q. Did you actually see him bringing cocaine into the house?

A. Yes.

Q. And you also testified that you saw him with weapons?

A. Yes.

Q. Was this on one occasion or—

A. A few times, the time he came and the time he left.

Q. But you testified you only saw three guns in the house?

A. Right.

---

1. The report also indicated that "ATF agents are of the opinion that defendant [and another party] were involved in the 'straw purchase' of other firearms." There was apparently no indictment with respect to other guns allegedly illegally obtained. There was no evidence that Bronaugh possessed the .45 L.A.R. Grizzly (or any other weapon) at the Detroit airport when arrested October 19, 1988.

2. This guideline (now renumbered as 2K2.-1(c)(2)) states:
   (c) Cross Reference
   (1) If the defendant *used the firearm* in committing or attempting another offense, apply the guideline in respect to such other offense, or § 2X1.1 (Attempt or Conspiracy) if the resulting offense level is higher than that determined above.
   (Emphasis added).

Q. Did you actually see him with one of the guns?

A. The rifle.

Q. And that was the only thing you saw him with?

A. Right.

Q. The only weapon?

A. Right.

Q. And that's during that entire period of June through October?

A. Right.

The presentence report, however, indicated that Gibson told ATF agents in November 1988 (six months prior to his hearing testimony) that on October 12, he, Pam Hamilton, defendant, and another party known as "K," had gone to Sam's Emporium to buy two pistols, chosen and paid for by Bronaugh, and that they had then gone to Pam's house with the guns. It concluded: "Gibson told agents that he had not seen the defendant, 'K,' or the guns since that day." He testified at another point that he had seen defendant in possession of a rifle at the Akron drug house. The weapon in question was never seized; no one testified definitively that Bronough was seen at the drug house with it, and the only weapon ever seized at that location was one AK–47 gun in March 1989. No one ever testified that the gun was ever *used* or displayed at the drug house, and I find no reasonable inference to that effect.

It seems clear to me that the burden was upon the government to show at the sentencing hearing that the particular weapon, which was the subject of the indictment, had to have been used in "committing or attempting another offense" for guideline § 2K2.1 to apply in this case. It also seems clear that the government failed to make the requisite showing, although it may have shown that Bronaugh used or possessed *other* weapons in respect to cocaine trafficking from June through September 1988. The government also demonstrated that Bronaugh possessed cocaine a

week after the indictment offense at the Detroit airport. That offense, of course, has no direct relevance to the indictment offense.

Defendant has certainly been, based on the testimony of witnesses and the record information, involved in considerable criminal activity. He has been indicted, however, for obtaining one particular weapon on a certain date, but the district court failed to indicate how it found that this firearm was *used* in an ongoing drug operation. There was no connection demonstrated between that weapon and the Detroit airport state offense, which was still pending at the time of sentencing in this case.

I am troubled by what was done in this case. Defendant was sentenced for criminal activity (distribution of cocaine) for which he was never indicted. No reason was given as to why Bronaugh could not feasibly have been indicted, or be indicted and sentenced, *beyond* a term of five years for such activity.[3] The government produced witnesses whose testimony clearly established this unlawful drug conduct, but there was a failure to tie this conduct to the particular .45 L.A.R. Grizzly pistol as is required under the guidelines, particularly § 2K2.1(c)(1). At the very least, the matter should be remanded to the district court to indicate just what evidence tied the indictment gun to the illegal drug activity, or any attempted illegal drug activity. I disagree that the evidence establishes that the indictment weapon was even by inference used in the drug house, although his appellate counsel seemed to infer that it might.[4]

What has occurred here seems to me to be a classic case of the tail wagging the dog. The district court has permitted the prosecution, without indictment, information or formal charge, and without a trial at which evidence would have to establish guilt beyond a reasonable doubt, under

---

3. He also might be indicted for conspiracy and involvement with others in acquiring other weapons in violation of 18 U.S.C. §§ 922(a)(6) and 924(a). It is a mystery why defendant was indicted for illegal acquisition of only one instead of two pistols on October 12, 1988.

4. He stated that "we don't have actual evidence that they went into the house." The burden is upon the government to prove this essential fact.

guise of a relatively minor gun offense, to escalate the sentence based on unconnected charges involving drugs. The latter activity, in my view, was not shown even by a preponderance of the evidence to be directly related to the specific single weapon identified in the indictment.[5] In this type of situation, the courts should require the government to bring forward the serious charge (in this case, the cocaine and drug house operation) for proof before a jury, especially where defendant was known to be involved in possession of other guns at the drug distribution location. I cannot countenance here a "back door" approach demonstrated by the circumstances of this case—to charge defendant with a single gun offense (with a base offense level of only 9, involving a sentence of less than one year) and then seek to sentence defendant with relation to other uncharged offenses without proof of a direct relationship between the relatively minor gun offense, the particular pistol, and the serious drug charges.[6] I am further troubled by the failure of defendant's counsel to pursue this problem at the sentencing hearing and in appellate argument in light of the district court's questions and expressions of doubt, particularly since the particular weapon was never seized or identified at the crack house or at the Detroit airport. I find no real basis for his possible concession at oral argument that there was a fair inference that defendant took the weapon to the drug house. There is no evidence that anyone saw it displayed or *used* there.

I recognize that under the guidelines a district court may take into account related offenses, or tie an illegal acquisition of a weapon or weapons to a directly related criminal offense, or attempted offense, in which the weapon was utilized.

5. At least a preponderance of the evidence standard is required and the burden is upon the government to prove the necessary § 2K2.1(c)(1) relationship.

6. The prosecutor stated at sentencing:
I believe the burden is on the government to show that gun was used to facilitate the use of cocaine, yes. And the evidence that we presented is simply the testimony evidence

The commentary to § 2K2.1, quoted in the majority opinion, is simply not applicable to this situation. It refers to using this section as a device to exercise jurisdiction over offenses that "otherwise could be prosecuted only under state law." The ongoing drug distribution offenses are clearly subject to federal prosecution. The airport cocaine seizure is already being prosecuted in a separate state proceeding. At issue in this case is the "true nature" of the single gun offense and whether it has been shown to have clearly and directly been involved in drug activity. I think not.

I would, therefore, reverse for resentencing for the reasons indicated. The government could then proceed, if it chooses to do so, to charge defendant with the serious drug trafficking in separate proceedings. This would surely be in the interests of justice and fairness under the circumstances.

that the witnesses that were there at the house testified that guns were a definite part of this operation.
Everyone had guns. I believe Miss Hamilton said that Mr. Bronaugh had several pistols and which I believe she described as AK–47, he kept with him. She did not identify the weapon as a .45 caliber, however. She did identify it that he did have a pistol and did have a long gun.