38 F.3d 1217
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Gary McCLELLAN a/k/a Jerome L. McCLELLAN a/k/a James Johnson
a/k/a Lenn Jerome Johnson a/k/a Kent Jackson,
Defendant-Appellant.
 No. 93-4084.
 United States Court of Appeals, Sixth Circuit.
 Oct. 25, 1994.
 
 Before: KEITH, BOGGS, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Gary McClellan ("McClellan"), also known by a number of aliases, was convicted by a jury on all counts of a seven-count indictment charging him with controlled-substance and firearm offenses. Because of prior criminal convictions, he was sentenced to life imprisonment without release. He was also sentenced to consecutive prison terms of five years and twenty years for two violations of 18 U.S.C. 924(c). He appeals from his convictions and sentence. For the reasons set forth below, we affirm.
 
 
 2
 * On June 11, 1991 ("the first incident"), Officer Sampson was cruising on night patrol in Cleveland, Ohio, when he saw a T-shirted individual standing on a sidewalk with both hands held high, as though he had just been robbed. Suspicious, Sampson followed a Chrysler New Yorker automobile, driven by McClellan, that he observed leaving the scene, and he radioed for backup assistance. After reporting the car's license plate number over his radio, he learned that the plate was registered to a Volvo automobile. The Chrysler traveled to a nearby gas station, and the driver got out of the vehicle, leaving the door open. Officer Sampson approached McClellan, who identified himself as "Lenn J. Johnson" and presented a driver's license with that name.
 
 
 3
 Officer Lauer arrived to provide the requested backup support. Lauer went to the Chrysler and saw a plastic bag in plain view on the driver-side floor. Alongside it, there were two white envelopes, each with paper inside. A police supervisor was called, and the officers were instructed to arrest McClellan. The bag was found to contain 69.64 grams of cocaine. The unsealed envelopes contained notes, addressed "Dear Mac,"[1] that used jargon associated with drug trafficking.[2] In addition, two pagers were found, as well as a small bag of cocaine in the ashtray. McClellan was charged with possession of cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 841(a).[3]
 
 
 4
 On the night of June 22, 1991 ("the second incident"), Officer Shoulders saw a Chevrolet Celebrity automobile parked in the Garden Valley Estates public housing project of Cleveland. He knew that the area was a site of frequent drug activity. A group of men were huddled around the driver's side of the car, and the officer walked over to assess whether there was any problem. As he approached the group, the various men all scattered from the scene, while the driver extended his left arm out of the window and tossed a brown paper bag into the air. The bag landed near Shoulders's feet. It contained 27.05 grams of crack cocaine, which had been broken into 155 "rocks" and packaged in 19 plastic bags. McClellan, who identified himself as "Lenn Johnson," was placed under arrest, and his car was impounded. Before the car was towed, the police conducted a routine inventory of the vehicle. Shoulders found a pager clipped to the driver-side sun visor and a notebook on the passenger-side floor. The notebook contained lists of numbers that police suspected were codes referring to drug transactions. Furthermore, the police looked inside the trunk, which they opened with a key found in the car's ignition. They found three firearms, including a .22-caliber revolver and a Ruger 9-millimeter semi-automatic handgun, both of which were together in a box, and a Mossberg .20-gauge pump shotgun, contained in a bag and loaded with five live shotgun shells.[4]
 
 
 5
 Thirteen months later, on the night of July 27, 1992 ("the third incident"), Officer Bruening spotted an Oldsmobile Cutlass automobile travelling at 75 miles per hour, twenty miles above the lawful speed limit, on Interstate 90 in Euclid, Ohio. The officer stopped the car and asked the driver, who was McClellan, for his license. The driver could not produce a license at first. Instead, he leaned over to his right and opened a black leather bag on the front passenger seat. Bruening became concerned and drew his gun. The officer noticed an open beer bottle whose contents were "spilling on the [car] floor." Eventually, the driver presented a license issued in the name of "Kent Jackson." A radio check led to three discoveries: (1) "Kent Jackson" was wanted on an outstanding Cleveland traffic-misdemeanor warrant; (2) the Cutlass was registered to "Lenn Johnson"; and (3) "Lenn Johnson" was wanted on an outstanding felony drug warrant. Bruening suspected that "Jackson" and "Johnson" might be the same person. When the "Lenn Johnson" photo arrived on Bruening's car facsimile machine, Bruening's suspicion was confirmed.
 
 
 6
 Bruening requested backup support and placed McClellan under arrest because of both the outstanding felony warrant for "Johnson" and the open beer bottle. He looked inside the black leather bag and found a scale that later tested positive for cocaine residue. Backup support arrived, and the police impounded McClellan's car. Before having the car towed for safekeeping, Officer Schervish conducted a routine inventory inspection. He found a Smith-and-Wesson 9-millimeter semi-automatic pistol and a bag containing 170.51 grams of crack cocaine inside the car's glove compartment. Schervish testified that the glove compartment was unlocked. The police towed the car to Action Auto Body, the lot where they impound such vehicles. They also received a report from the Bureau of Criminal Identification that "Kent Jackson" and "Lenn Johnson" were aliases used by Jerome McClellan, who is the same person as Gary McClellan. When McClellan's car was later retrieved, the lock to its glove compartment was found to be broken, and the car stereo was missing.
 
 
 7
 On August 20, 1992, an original seven-count indictment was handed down against McClellan by the grand jury, charging him with crimes arising from the three incidents. The first, second and fifth counts charged violations of 21 U.S.C. Sec. 841(a). Count 1 charged that McClellan had knowingly possessed, with the intent to distribute, 69.64 grams of cocaine on the night of the first incident. Count 2 charged that McClellan possessed, with the intent to distribute, 27.05 grams of cocaine base ("crack cocaine") on the night of the second incident. Count 5 charged that McClellan possessed, with the intent to distribute, 170.51 grams of cocaine base ("crack cocaine") on the night of the third incident. Counts 3 and 6 charged McClellan, a previously convicted felon, with illegally possessing firearms on the nights of both the second and third incidents, in violation of 21 U.S.C. Sec. 922(g)(1). Counts 4 and 7 charged McClellan with using and carrying firearms during and in relation to the drug trafficking crimes that occurred on the nights of the second and third incidents, in violation of 21 U.S.C. Sec. 924(c).
 
 
 8
 After a jury trial, McClellan was convicted on all counts and was sentenced to life imprisonment without release, under count 5, after the court determined that he had two prior convictions for felony drug offenses. 21 U.S.C. Sec. 841(b)(1)(A)(iii). He appeals from his convictions and sentence.
 
 II
 
 9
 McClellan maintains that the three separate incidents for which he was arrested should have been tried in three separate trials. In each incident, he was arrested under circumstances that he believes can be explained persuasively enough to win a jury's acquittal.[5] He claims, however, that he was prejudiced by the heavy burden of coming before a jury and trying to explain away each of three separate incidents, all bundled together.
 
 
 10
 The government acknowledges that consolidation of charges into one trial has the potential to prejudice aspects of a defense. "[J]uries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one. But Congress has authorized consolidation in the belief that public considerations of economy and speed outweigh possible unfairness to the accused." United States v. Smith, 112 F.2d 83, 85 (2d Cir.1940). Therefore, in the interests of judicial economy:
 
 
 11
 Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
 
 
 12
 Fed.R.Crim.P. 8(a) (emphasis added). Considerations of economy and speed are not less pressing today than they were in 1940.
 
 
 13
 In this case, all seven counts of the indictment, "charged in ... separate count[s] for each offense," are of "the same or similar character." McClellan was arrested in all three instances on drug charges. The first two incidents took place along Kinsman Avenue in the same city, less than two weeks apart. The third incident occurred in the nearby Euclid section of Cleveland. In the second and third incidents, McClellan had crack cocaine and at least one 9-millimeter semi-automatic handgun in his car. Moreover, the charge of felon-in-possession that resulted from each of those two arrests would have required the prosecution to present similar proofs of McClellan's predicate felony offenses. In both of the last cases, police searched McClellan's car pursuant to routine inventory procedures that precede towing for safekeeping, and he challenges the constitutionality of both those searches, raising similar legal questions.
 
 
 14
 In all three incidents, McClellan used names other than "Gary McClellan," the name under which he comes before this court today, and he twice presented driver's licenses in different names.[6] Although the third incident took place one year after the first two, that time lapse was not fatal to joinder. McClellan points to no case in which this court has ever held otherwise. The issue of severance is left to the trial judge's sound discretion. United States v. Harris, 635 F.2d 526, 527 (6th Cir.1980), cert. denied, 451 U.S. 989 (1981). We find no evidence that the judge abused that discretion in this case.
 
 III
 
 15
 McClellan claims that his Fourth Amendment rights were violated when the police conducted inventory searches of his Chevrolet on the night of the second incident and of his Oldsmobile on the night of the third incident. During each of those searches, police uncovered and seized incriminating evidence, which they later used against McClellan at trial.
 
 
 16
 The courts have traditionally interpreted the Fourth Amendment to allow law enforcement officers greater leeway when conducting warrantless searches inside vehicles than they enjoy when searching homes or offices without a warrant. The "automobile exception" dates back to Carroll v. United States, 267 U.S. 132 (1925). Even when a car is impounded for a municipal parking violation, the police may enter the car to inventory all items in plain view, may open an unlocked glove compartment, and may seize anything illegal that they happen to discover in the process.
 
 
 17
 Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.
 
 
 18
 The expectation of privacy as to automobiles is further diminished by the obviously public nature of automobile travel.... "A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view."
 
 
 19
 ....
 
 
 20
 When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection [of] the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.... In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned.
 
 
 21
 ....
 
 
 22
 [T]his Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents.
 
 
 23
 South Dakota v. Opperman, 428 U.S. 364, 368-73 (1976) (citations omitted) (footnotes omitted). The Opperman Court approved a glove-compartment search "since it is a customary place for documents of ownership and registration, as well as a place for the temporary storage of valuables." Id. at 372 (citation omitted). Indeed, the Opperman Court reaffirmed an earlier Supreme Court decision that upheld the constitutionality of a warrantless inventory and glove-compartment search that had been conducted an entire week after the car had been impounded, even though that search had been conducted in a "distinctly criminal setting," in which constitutional protections are applied with heightened sensitivity. Id. at 373 & n. 7 (citing Cooper v. California, 386 U.S. 58 (1967)).
 
 
 24
 The "automobile exception" is broad, but it is restricted by the caveat that the searching officers must have probable cause. "[T]he exception to the warrant requirement established in Carroll ... applies only to searches of vehicles that are supported by probable cause.... [A] search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." United States v. Ross, 456 U.S. 798, 809 (1982).
 
 
 25
 In the first incident, Officer Sampson believed that a robbery may have occurred when he saw a man with his hands held high. He further suspected criminality when he learned that the license plate on the Chrysler New Yorker was apparently registered to a Volvo. The officer had reason to suspect that criminal activity was afoot. See Terry v. Ohio, 392 U.S. 1 (1968). "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 143, 146 (1972).
 
 
 26
 Subsequently, after Officer Lauer discovered the plastic bag of cocaine in plain view, the police had probable cause to arrest McClellan. Texas v. Brown, 460 U.S. 730 (1983). Police are permitted to search the sections of a vehicle within a suspect's control incident to his arrest, even after he has been handcuffed and can no longer control or reach those areas. United States v. White, 871 F.2d 41, 43-44 (6th Cir.1989).
 
 
 27
 In the second incident, as Officer Shoulders approached the Chevrolet Celebrity, he saw the driver's outstretched arm toss a brown bag into the air, and it landed at his feet. The bag contained 155 rocks that he suspected were crack cocaine. The officer had probable cause to arrest McClellan and to conduct a search of the car's cabin incident to the arrest. Although McClellan claims that there was no reason for the car to be towed away for safekeeping, the record reflects that McClellan was not a resident of the housing project in whose lot his car was located. Once the police decided that it would be necessary to tow the car for safekeeping, they were permitted to prepare a thorough inventory of the vehicle's contents.
 
 
 28
 In the third incident, Officer Bruening was concerned because the driver he had stopped continued to lean over to the front passenger seat and to place his hand in a black leather bag. The driver presented a driver's license bearing the name of a person wanted on an outstanding municipal warrant, and the driver was identified during the course of a radio check as someone else who was wanted on an outstanding felony warrant. There was probable cause to arrest McClellan and to conduct a search of the driver's cabin incidental to the arrest.
 
 
 29
 The police maintain that the Oldsmobile Cutlass's glove compartment was unlocked; therefore, they looked inside it during that search. McClellan claims that the police tampered with and broke the glove compartment's lock.[7] A reasonable jury could have believed the police officers' explanations and found that the different items of evidence against McClellan had been lawfully seized from his trunk after the second incident and from his glove compartment after the third incident. Therefore, we hold that the Fourth Amendment was not violated during either of the two automobile-inventory searches that McClellan challenges.
 
 IV
 
 30
 McClellan claims that the three firearms found in his trunk during the police inventory after the second incident had been locked away, well out of his reach. Therefore, he argues that the evidence does not support a finding that he carried or used those weapons during or in relation to a drug crime. However, this court applies the "fortress theory" to 18 U.S.C. Sec. 924(c). United States v. Henry, 878 F.2d 937, 944 (6th Cir.1989). Under that theory, this court would consider a vehicle's trunk to be part of a drug trafficker's automobile "fortress," in a case where firearms have been found in the trunk of a car that is being used by a drug trafficker for the illegal transport of controlled substances. See United States v. Acosta-Cazares, 878 F.2d 945, 951-52 (6th Cir.) (citing with approval cases that have applied Sec. 924(c) to firearms transported in a criminal's glove compartment or trunk), cert. denied, 493 U.S. 899 (1989); accord United States v. Castro-Lara, 970 F.2d 976, 982-83 (1st Cir.1992) (holding that a jury could find a violation of 18 U.S.C. Sec. 924(c) even though the firearm was an unloaded revolver located within a briefcase inside a locked trunk), cert. denied, 113 S.Ct. 2935 (1993).
 
 
 31
 With regard to the third incident, McClellan proffered the testimony of a friend and next-door neighbor, Preston, who told of borrowing McClellan's Cutlass the day before the incident. According to Preston, McClellan knew nothing of the brown bag and gun inside the glove compartment, which was locked at the time that McClellan drove the Cutlass. Officer Schervish contradicted Preston and testified that he had found the glove compartment unlocked. Moreover, Preston's prior cocaine conviction and his friendship with McClellan were presented to the jury. It was not irrational for the jury to credit the government's evidence that McClellan was responsible for the contents of the Cutlass's glove compartment.
 
 V
 
 32
 McClellan's two prior Ohio felony drug convictions stemmed from incidents that occurred fifteen weeks apart, on July 7, 1988, and on October 19, 1988. He was convicted of both crimes on the same day because he chose to plead guilty to both crimes on the same day, February 16, 1989. However, the crimes were investigated and charged by two different grand juries. They were docketed as two separate cases. The guilty pleas were entered separately. After the July incident, McClellan was arrested as Jerome McClellan, and he was indicted on August 1. While that indictment was pending, he was subsequently arrested on October 19 under the name of "James Johnson." He was indicted on November 21, 1988.
 
 
 33
 In United States v. Brady, 988 F.2d 664 (6th Cir.) (en banc), cert. denied, 114 S.Ct. 166 (1993), this court found that two armed robberies committed less than forty-five minutes apart on the same evening with the same weapon were "separate criminal episodes." In United States v. Roach, 958 F.2d 679, 683-84 (6th Cir.) cert. denied, 113 S.Ct. 135 (1992), this court held that three drug sales that occurred within fifteen days constituted three separate and distinct criminal episodes, even though: (1) two of the sales had been between the same buyer and seller; (2) all three transactions had been charged in the same indictment; (3) they had all been tried in the same court; and (4) all three convictions occurred on the same day.
 
 
 34
 The Brady and Roach precedents support the district court's finding that McClellan's prior Ohio felony drug convictions were two separate convictions, constituting the predicate crimes that mandated a life sentence without release upon McClellan's conviction, under count 5, of possessing with intent to distribute more than 100 grams of crack cocaine.
 
 VI
 
 35
 For the foregoing reasons, we AFFIRM McClellan's convictions and sentence.
 
 
 
 [1]
 The defendant, charged in this case as "McClellan," has the phrase "Gangster Mac" tattooed on his bicep
 
 
 [2]
 One letter requested the opportunity to sell "packages," a term often used for drug sales. The other letter referred to giving a "houseman" money. Officer Shoulders testified that a "houseman" is a person who is in charge of a "drug house."
 
 
 [3]
 Ironically, it was later learned that Defendant's car bore the wrong license plate because of a clerical error that had been made by an employee of the agency where the car had been rented
 
 
 [4]
 The shotgun was shorter than the regular version, and it had a pistol grip for "close-in shooting." Such shotguns are used by the Cleveland SWAT team
 
 
 [5]
 McClellan maintains that a reasonable jury could be persuaded that it is not believable that he would have left his car door wide open on the night of the first incident if he had drugs in plain view on the driver's side floor. Second, he believes that, in the course of a separate trial, another reasonable jury could be persuaded that a drug dealer would not toss a brown bag of crack cocaine in the direction of an oncoming police officer's feet and that he can convince such a jury that the firearms found in his trunk were uncovered in the course of an unlawful search and seizure. Furthermore, he believes that a third separate trial would result in his persuading a third reasonable jury that an officer without radar would not have stopped him for speeding and that he could persuade such a jury that the police unlawfully broke into his glove compartment, which he claims was locked when they entered his car. In addition, he maintains that the third jury would believe that the crack cocaine and handgun that were found in the glove compartment had been placed there by someone else
 
 
 [6]
 Defendant told the probation officer assigned to prepare his Presentence Investigation Report (PSI) that his name is "Lenn Jerome Johnson," not Gary McClellan
 
 
 [7]
 The police explain that they locked the glove compartment before towing the car for safekeeping and that the car was subsequently vandalized at the impound lot, resulting not only in damage to the glove compartment lock but also in the robbery of the car stereo