9 F.3d 110
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harold SPENCER, Jr., Defendant-Appellant.
 No. 92-6176.
 United States Court of Appeals, Sixth Circuit.
 Aug. 31, 1993.
 
 Before GUY and NELSON, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Harold Spencer, Jr., was convicted of two counts of being a felon in possession of firearms. He was sentenced to the statutory maximum of 120 months on both counts, with the sentences to run concurrently. On appeal, Spencer raises three issues: (1) there was insufficient evidence to convict him on count 2 of the indictment; (2) the sentence enhancement based upon one of the firearms being used to commit a murder was improper since there was no finding that the "indictment gun was used to commit any other offense"; and (3) the court erred in sentencing defendant "for the alleged underlying offense of murder, 18 U.S.C. 1111, in violation of his constitutional guarantees of due process of law, right to trial by jury and unanimous jury verdict."
 
 
 2
 After reviewing the record, we conclude there was no error in the district court and we affirm.
 
 I.
 
 3
 We take the facts in this case as they were set forth in the presentence report, since neither the government nor the defendant took issue with the probation officer's summary of what occurred.
 
 
 4
 6. During the late evening of April 10, 1991, Dennis Sewell and Edward Trent were talking inside of Sewell's car, which was parked in front of a trailer which Trent was renting in rural Wolfe County, Kentucky. After some time, Harold Spencer, a neighbor and owner of Trent's trailer, came to the side of the automobile where the two individuals were talking. Harold Spencer, armed with two small caliber handguns, began threatening Trent and Sewell.
 
 
 5
 7. After a few minutes, Harold Spencer went inside Trent's trailer where he confronted Wendy Friend, Trent's live-in girlfriend. Friend tried to calm Harold Spencer down and, upon noticing he appeared intoxicated, fixed him a cup of coffee. During the entire time Harold Spencer was inside the residence, he continued to tell Wendy Friend he was going to kill Edward Trent and went so far as to show Friend two small caliber weapons he had stuffed in his pants. After Harold Spencer went inside the trailer, Trent asked Sewell to go inside with him to make sure the children and his girlfriend, who were located inside, did not get hurt. Sewell made numerous attempts at stopping Trent from entering the trailer, but Trent insisted on getting the other individuals out of danger.
 
 
 6
 8. Upon entering the trailer, Trent was confronted by Wendy Friend who told him to get out of the trailer because Harold Spencer had told her he was going to kill him. Trent insisted on getting his clothes packed and getting the children out of the trailer. Trent attempted to go to the back of the trailer but was stopped by Harold Spencer in the living room. After a verbal confrontation, the two individuals began fighting. Seeing this, Wendy Friend ran to the bedroom where the children were located. She woke the children and took them out the back door. As she stepped down the last back step of the trailer, Friend heard a single gunshot from inside the trailer.
 
 
 7
 9. Friend and the children proceeded to Sewell's truck where she informed Sewell, Harold Spencer had killed Edward Trent. Since no one witnessed the shooting, Sewell attempted to convince her Trent may have not been the person shot. Believing Harold Spencer may have shot Trent and would want no witnesses, Sewell, Wendy Friend and the children drove to a grocery store where they called the police to report the shooting. They then proceeded to Wendy Friend[']s mother['s] residence to wait for the police.
 
 
 8
 10. Following the shooting, police arrived at the scene where they found Edward Trent's body laying dead in the living room of the trailer. Trent had been shot in the side of the head with a single .38 caliber round. No one else was located in the trailer when the police arrived. Witnesses were subsequently interviewed about the shooting and it was determined Harold Spencer should be questioned about the murder. Police went to Harold Spencer's residence, which is located within 150 feet of the trailer. Upon entering the house, police noticed Spencer appeared intoxicated. He was very belligerent with the officers but eventually agreed to go to the police station for questioning.
 
 
 9
 11. While Spencer was at the police station, police searched Spencer's residence and the area directly around the property. Located about 150 feet from the property was a shotgun lying on a bank near a trash pile. Thirty feet down the road from the shotgun, police found two .38 caliber revolvers and [a] .22 caliber rifle lying in the road. One of the .38 caliber weapons had a spent round under the hammer....
 
 
 10
 (App. 20-21).
 
 
 11
 Spencer was arrested and subsequently indicted by a state grand jury for murder. Based upon his prior felony record, Spencer also was indicted by a federal grant jury for possession of firearms.
 
 II.
 
 12
 A. Sufficiency of the Evidence as to Count 2
 
 
 13
 Count 2 of the indictment charged possession of the four firearms found by police behind Spencer's residence. Spencer argues that since the firearms were found on the ground near his residence, there is insufficient evidence tying him to the weapons. The government counters that there is sufficient circumstantial evidence to support a finding of constructive possession.
 
 
 14
 The weapons were found on a path leading from Spencer's house, which path does not connect with any other residences. The weapons were not covered in any manner. After being arrested and given Miranda warnings, the defendant admitted he had purchased the two pistols at a flea market. The discovery of these two firearms occurred a short time after defendant had brandished a weapon in front of Dennis Sewell that resembled the gun that had a spent round under its hammer. In addition, prior to his arrest, the defendant was seen in possession of two pistols by Wendy Friend.
 
 
 15
 When reviewing a claim of insufficient evidence in the context of the denial of a motion for acquittal, we apply the following standard of review:
 
 
 16
 It is well settled that the test to be applied by a trial court in determining a defendant's motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is taking the evidence and the inferences most favorably to the government, if there is such evidence therefrom to conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is for the jury. The Supreme Court has observed that the granting of a motion of acquittal[ ] " ... will be confined to cases where the prosecution's failure is clear."
 
 
 17
 An appellate court, in reviewing a trial court's decision regarding a Rule 29 motion, applies the same principles to the record it has before it. Other circuits have indicated the use of the same test following the trial court's reversal of a guilty verdict pursuant to Rule 29(c).
 
 
 18
 United States v. Overmyer, 867 F.2d 937, 938 (6th Cir.) (citations omitted), cert. denied, 493 U.S. 813 (1989) (citations omitted).
 
 
 19
 When this standard is applied here, we believe that the jury could conclude that after Friend and Sewell left Spencer knew the police would soon arrive and so he went home and hurriedly disposed of all the weapons he had in his possession. To the degree the hiding of the weapons left something to be desired, it must be remembered that Spencer was intoxicated at the time.
 
 
 20
 B. Did the Trial Court Make a Proper Finding That One of the "Indicted Weapons was Used to Commit a Murder?
 
 
 21
 This issue arises from the fact that under the sentencing guidelines, if an illegal firearm is used to commit another offense, the court must sentence the defendant under the highest offense guideline that is applicable.[1] The most applicable guideline here was first degree murder.
 
 
 22
 Spencer argues that although the court made a finding that he had murdered Trent, it "made no finding that any of the indicted weapons were used by ... Spencer in the course of that conduct." (Def's Brief at 13). We find this argument unsupported by the record.
 
 
 23
 As a result of pretrial rulings, the government was prohibited from telling the jury that Spencer had murdered Trent, since this would be very prejudicial in a firearms case. The court indicated, however, if Spencer were convicted, the facts surrounding the murder would be explored at sentencing. After Spencer's conviction, the prosecutor advised the court and defense counsel that a hearing would be necessary to determine whether a firearm possessed by the defendant was used in the murder of Trent.
 
 
 24
 The presentence report also put the defendant on notice that the probation officer had computed an offense level on the basis of a conclusion that Spencer had used one of the weapons he illegally possessed as a convicted felon to murder Trent. Objections to the report were filed by the defendant, and so the court scheduled an evidentiary hearing.
 
 
 25
 At the evidentiary hearing, Sewell and Friend both testified that one of the weapons being brandished by Spencer was sufficiently similar to one of the weapons charged against Spencer to support a finding by the court of the use of that weapon in the murder. The caliber of the weapon was the same as the weapon that killed Trent, and a ballistics expert could neither rule in nor rule out that the fatal shot was fired from one of Spencer's pistols.
 
 
 26
 Furthermore, count 1 of the indictment charged Spencer with the possession of two unspecified firearms on the date of the murder. Once the court concluded that Spencer had shot Trent, then any firearm he used would have been an illegal firearm, since, as a convicted felon, he was not allowed to possess a firearm. Thus, the pivotal inquiry becomes whether the court properly concluded that a preponderance of the evidence supported the conclusion that Spencer shot and killed Trent. We now turn to that issue.
 
 
 27
 C. Was the Offense Level Properly Computed by Using the Base Offense Level for First Degree Murder?
 
 
 28
 Implicit in defendant's arguments are two contentions. First, the evidence did not preponderate that Spencer had murdered Trent. Second, due process is offended because the indictment did not give notice of the prosecutor's intent to enhance the penalty assessed by using the base offense level for murder.
 
 
 29
 As to the first issue, we find the testimony of Sewell and Friend coupled with the ballistics evidence (one shot had been recently fired from one of the pistols and ballistics could not rule it out as the murder weapon) sufficient to support a finding by a preponderance of the evidence that Spencer shot and killed Trent.
 
 
 30
 Spencer's due process argument suffers from a number of deficiencies, including the failure to raise this issue in the district court. Apart from that, however, we note that Spencer's sentence was limited by the statutory maximum for the firearms charge of 120 months, notwithstanding that the guideline sentence computation was much longer. Spencer certainly was on notice at all times of the maximum penalty he faced on the firearms charge. Thus, there was no enhancement of the penalties for the offenses of conviction. Although the indictment itself, like all indictments, makes no reference to the sentencing permutations made possible by the sentencing guidelines, Spencer was on notice early on that the government would seek enhanced penalties if a conviction occurred. This was made clear when the court prohibited the government from referencing the murder during the trial before the jury. Again, after the verdict, the prosecutor advised the court, that as a result of the requirements of section 2K2.1(c) of the guidelines, an evidentiary hearing would be necessary.
 
 
 31
 Next, the presentence report set out in detail the thinking of the probation officer as to how section 2K2.1 was implicated. Since defendant formally objected to this computation, he clearly was on notice of its potential application.
 
 
 32
 Defendant also argues that the use of uncharged conduct in the sentencing calculus violates his Sixth Amendment right to trial by jury. In a related argument, Spencer asserts that the use of a preponderance of the evidence standard also violates his constitutional rights. Both of these arguments are foreclosed by Supreme Court precedent as well as binding precedent from this circuit. In McMillan v. Pennsylvania, 477 U.S. 79 (1986), the Supreme Court addressed the issue of whether a portion of Pennsylvania's sentencing legislation violated the Due Process Clause of the Fourteenth Amendment or the jury trial guarantee of the Sixth Amendment. The legislation at issue provided that anyone convicted of certain enumerated felonies would be subject to a minimum sentence of five years' imprisonment if the sentencing judge found by a preponderance of the evidence that a firearm had been "visibly possessed" during the commission of the offense. The Court concluded that applying a preponderance of the evidence standard to sentencing factors satisfies due process, even though a higher standard of proof is required to establish guilt of the substantive offense. The Court then held that "there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." Id. at 93 (citation omitted).
 
 
 33
 Similarly and more specifically, in discussing the ramifications of section 2K2.1, we have held:
 
 
 34
 It may be thought anomalous that a defendant can receive a five-fold increase in his sentence because a preponderance of the evidence indicates he is guilty of an uncharged crime. But such increases are possible, under the guidelines....
 
 
 35
 United States v. Bronaugh, 895 F.2d 247, 251 (6th Cir.1990). In language clearly relevant to the arguments Spencer makes here, we then went on to state:
 
 
 36
 It is also important to note that the guidelines cannot result in the imposition of a sentence outside a range set by statute. Whatever the sentence to which defendant Bronaugh would have been subjected had he been convicted of drug trafficking, the sentence he actually received did not exceed the maximum that Congress thought would be appropriate for the weapons offense of which he was convicted. Before the advent of guideline sentencing, there could have been no doubt of the authority of the district court to impose a five-year sentence for the weapons offense. The imposition of a five-year sentence under the guidelines is certainly no more anomalous than the imposition of the same sentence would have been in the pre-guideline era.
 
 
 37
 Id. at 251-52.
 
 
 38
 AFFIRMED.
 
 
 
 1 U.S.S.G. Sec. 2K2.1(c)(1)(A) provides:
 (1) If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense, apply--
 (A) Sec. 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above....
 
 
 U
 S.S.G. Sec. 2X1.1(a) provides:
 (a) Base Offense Level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.