**UNITED STATES of America**

v.

**Antonio TORRES, Appellant.**

**No. 88–1503.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 1, 1988.

Decided Dec. 9, 1988.

Stanley Weinberg (argued), Philadelphia, Pa., for appellant.

Frank R. Costello, Jr. (argued), Walter S. Batty, Jr., Chief of Appeals, Linwood C. Wright, Asst. U.S. Attys., Edwards S.G. Dennis, Jr., U.S. Atty., Philadelphia, Pa., for appellee.

Before GIBBONS, Chief Judge, and BECKER and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

We decide in this appeal that a conspiracy to distribute drugs may be a predicate offense to a statute providing an enhanced sentence for the use of a firearm during a "drug trafficking" offense. We also conclude that a city policeman assigned to the United States Drug Enforcement Agency may be a *de facto* agent within the scope of a statute prohibiting assaults on federal officials. Accordingly, we will affirm the convictions on these offenses, but because of a duplicitive sentence on two counts we will remand for the entry of a general sentence on those charges.

Defendant was convicted on four counts of an indictment charging in count 1, conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846; count 3, assaulting a federal officer, in violation of 18 U.S.C. § 111; count 4, using a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1); and count 5, using a firearm in connection with an assault on a federal officer, in violation of 18 U.S.C. § 924(c)(1). The district court imposed concurrent sentences of three years imprisonment on counts 1 and 3, and consecutive five-year terms on counts 4 and 5.

The defendant's convictions were based on events that occurred on October 16, 1987 at the intersection of Third and Ontario Streets in Philadelphia. While driving through the area, undercover police officers Ronald Abel and Jorge Cruz noticed the suspicious behavior of two men, Neris and DeJesus, standing on the street corner. The officers circled the block and parked their car near the intersection so that they had an unobstructed view of the two suspects' activities.

For some time, the policemen watched the two men take small packets from an aerosol can and sell them to certain passing motorists. The officers then drove into the intersection, stopping their car crosswise against the southwest corner. They inspected the can and, finding that it contained glassine packets of a white substance, arrested and handcuffed Neris and DeJesus. Officer Abel returned to the car to radio for assistance while Officer Cruz remained with the two suspects.

At this moment, defendant—driving north on Third Street—brought his car to a screeching stop at the intersection and, taking a carbine from the front seat, pointed it at Officer Abel as the policeman was radioing in the arrest report. Noticing the defendant's actions, Officer Cruz drew his revolver and shouted, "Police; Drop it or I'll shoot." Defendant lowered the carbine and surrendered it to Officer Cruz, who took him to where the two suspects were standing.

Defendant stretched out prone on the sidewalk as directed by the officers. After a few minutes, defendant attempted to rise and, as Officer Cruz forced him back down, defendant struck his head on the sidewalk, provoking DeJesus to exclaim: "Tony, stop. It won't help any." When defendant was searched, $942 in currency was found in his pocket.

DeJesus and Neris both pleaded guilty to narcotics charges, but defendant main-

tained his innocence. At his lawyer's request, defendant was examined before trial by a psychiatrist who reported that defendant asserted he was intoxicated at the time of his arrest. Defendant asked the court for, but was refused, a continuance to permit further mental evaluation by a psychologist.

At trial Officer Abel testified that he had been employed by the Philadelphia Police Department since 1981, and in June 1987 had been assigned to the Federal Drug Enforcement Administration Task Force. He stated that, though he remained a city policeman, he took an oath as a DEA Task Force member. DeJesus and Neris did not testify, nor did defendant or his psychiatrist.

After the trial concluded, defendant was evaluated by a psychologist. On the basis of the psychologist's comments about the defendant's alleged intoxication, defendant moved for a new trial. The district court denied the motion, ruling that the matters the psychologist had recounted were not newly discovered evidence.

On appeal defendant presses a number of theories for reversal. First, he contends that there was insufficient evidence to prove that he participated in the DeJesus/Neris conspiracy. Second, he asserts that the government's evidence that Officer Abel was a federal official at the time of the assault was inadequate. Third, he argues that conspiracy is not a predicate offense for enhanced punishment under section 924(c)(1). Fourth, he insists that his consecutive five-year sentences on the two section 924(c)(1) counts are duplicative, and that only one such term of imprisonment is permissible.[1]

The prosecution concedes that only one firearm incident occurred here and, therefore, only one enhanced punishment may be imposed. The government agrees that the case must be remanded for resentencing on counts 4 and 5.

## I. COUNT 1—CONSPIRACY

■ Defendant insists that the government has failed to introduce any direct evidence of his involvement with the DeJesus/Neris drug distribution. He argues that the government's evidence against him on the conspiracy charge established only that he kept bad company and was found in the vicinity of criminal activity, conduct which we previously have held to be insufficient to prove a conspiracy. *See United States v. Wexler*, 838 F.2d 88, 91 (3d Cir. 1988); *United States v. Coleman*, 811 F.2d 804, 808 (3d Cir.1987); *United States v. Cooper*, 567 F.2d 252, 255 (3d Cir.1977). We find these precedents clearly distinguishable. As is true in most conspiracy cases, our holdings were heavily dependent on the factual backgrounds; in each of the cited decisions, the trial evidence failed to support an essential element of the crime.

Where a jury returns a verdict of guilty, we review the defendant's sufficiency of the evidence challenge by viewing the proof in the light most favorable to the government. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Although the elements of a conspiracy must be established beyond a reasonable doubt, *United States v. Johnstone*, 856 F.2d 539, 545 (3d Cir.1988), the prosecution can bear this burden entirely through circumstantial evidence, *Wexler*, 838 F.2d at 90; *United States v. Scanzello*, 832 F.2d 18, 20 (3d Cir.1987). The existence of an illegal agreement may be inferred from interrelated facts and circumstances which lead reasonably and logically to the conclusion that the activities of the participants would not have occurred as they did absent a preconceived scheme or common understanding. *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed. 2d 40 (1986).

---

1. Defendant also contends that the trial court abused its discretion in refusing a continuance for a psychological examination and that the prosecutor made improper comments during his closing address to the jury. We find no merit to these contentions and do not discuss them further.

The record shows that defendant lived and worked near the location where the cocaine was being sold, an area notorious for drug offenses. Both the intersection and the two other participants' conduct could be observed readily from a distance of at least fifty yards. Between thirty and sixty seconds after DeJesus and Neris were apprehended, defendant sped to the intersection brandishing a carbine. After defendant was arrested and as he seemingly attempted to resist, DeJesus urged defendant to "stop", because "it won't help any."

These circumstances support the government's theory of the defendant's role in the conspiracy: that he was to monitor the cocaine distribution from a concealed vantage point and, in the event of interference, to rush to the scene to provide protection for his confederates. The amount of currency found in the defendant's pocket tends to corroborate his involvement in drug transactions.

That the policemen were in plain clothes is not inconsistent with the government's theory. Before Officer Cruz identified himself as a policeman, defendant might well have surmised that the two officers were attempting to rob DeJesus and Neris of their cash and narcotics. Indeed, that assumption would seem more likely to have triggered the defendant's response than would have a desire to forcibly interfere with an arrest.

The evidence permits the inference that defendant played an integral role in the cocaine sales scheme. The conspiracy theory was adequately supported by circumstantial proof of a rational plan for protection directly related to distribution. In fact, the defendant's conduct might have supported an indictment for aiding and abetting as well. We conclude that the evidence admitted at the trial was sufficient to support a jury verdict that defendant was guilty of conspiracy. The conviction on this count will be affirmed.

## II. COUNT 3—ASSAULT ON A FEDERAL OFFICIAL

Defendant next contends that the government failed to prove that Officer Abel was protected by 18 U.S.C. § 111, which prohibits assaults against certain designated federal officials. The statute, in pertinent part, reads: "Whoever forcibly assaults ... any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined ... or imprisoned ... or both." 18 U.S.C. § 111. Among the officials listed in section 1114 is "any officer or employee ... of the Drug Enforcement Administration." 18 U.S.C. § 1114.

Abel testified that the resident agent-in-charge of the Philadelphia DEA office had administered an oath to him. Defendant contends, however, that to be considered a federal employee, Officer Abel had to have taken an oath before a person qualified to administer it. See 5 U.S.C. § 3331 ("An individual ... appointed to an office of honor or profit in the civil service ... shall take the following oath...."). Defendant maintains that the officer's testimony failed to establish both that the oath was administered by a statutorily authorized official and the date on which it took place. We are not persuaded by the defendant's arguments.

Statutory law permits the assignment of local employees to federal agencies "for work of mutual concern" determined to be beneficial to both the agency and the local government. 5 U.S.C. § 3372(a)(2). The local employee may "be appointed in the Federal agency," id. § 3374(a)(1), or "be deemed on detail to the Federal agency," id. § 3374(a)(2). If "detailed" to the federal government during the period of assignment, a local government employee "is not entitled to pay from the agency" except to the extent that the appropriate federal compensation would exceed that set by the local government. Id. § 3374(c)(1). In contrast, a local government employee "appointed" to the federal agency "is entitled to [federal] pay." Id. § 3374(b).

Set against this statutory framework, the defendant's premise that Officer Abel was "appointed," and thus required to take the section 3331 oath, is unsound. Because the policeman continued his employment

with, and was presumably paid by, the City of Philadelphia, his assignment to the DEA was apparently a "detail" rather than an "appointment." Defendant cites no authority for the proposition that local employees "detailed" to a federal agency are required to take an oath, though they are subjected explicitly to other federal statutory provisions.

We need not expressly resolve this issue, however, because the record supports grounds for the jury to have found that Officer Abel had taken an oath at the DEA before the arrest in October 1987. He had testified that he was placed on special assignment in "June of 1987." When asked, "precisely what did you have to do in order to go on the special assignment," Abel answered: "Once over at the Drug Enforcement Administration Task Force we did take an oath."

■ The defendant's argument that the government failed to establish that the oath was administered by a duly authorized official is also not dispositive. Precedent holds that impugning the authority of a person administering an oath of office will not deny an appointee the protection of a statute such as section 1114. In *Wright & Wade v. United States*, 158 U.S. 232, 15 S.Ct. 819, 39 L.Ed. 963 (1895), the defendant was charged with murdering a man appointed by a Deputy United States Marshal. The defendant, however, argued that his victim was not a federal official because he had been deputized by a deputy marshal who had himself been improperly sworn by a court clerk, one not authorized to administer such oaths. The Supreme Court rejected the defendant's contention and concluded that testimony of appointment and subsequent conduct as a deputy marshal was sufficient. "His appointment and service made him a *de facto* officer, even if the clerk who administered the oath was

not empowered to do so." *Id.* at 238, 15 S.Ct. at 821.

This same liberal interpretation has been applied in the section 111 context. In a series of cases, the Courts of Appeals have held law enforcement officers participating in a federal raid to be federal officials within the purview of section 111.[2] In *United States v. Williamson*, 482 F.2d 508 (5th Cir.1973), the defendant attempted to flee from the scene of an arrest and, in the process, his automobile struck a state narcotics agent. The Court affirmed the defendant's conviction, stating that because the state officer "was acting in cooperation with and under control of federal officers, in effecting an arrest for violation of the federal drug laws, assault against him was within the coverage of § 111." *Id.* at 512.

Likewise, in *United States v. Chunn*, 347 F.2d 717 (4th Cir.1965), the defendant was charged with "beating, striking, whipping and stomping" a state undercover agent who was assisting federal agents engaged in their official duties. In sustaining the sufficiency of the indictment, the Court of Appeals wrote: "Regardless of whether Boler, as an employee of the State of North Carolina who was on loan at the time of the assault to the Alcohol and Tobacco Tax Unit of the Internal Revenue Service by agreement of the two agencies, had any official duties is immaterial, since he was in fact assisting federal agents on said occasion in the performance of their official duties." *Id.* at 721. *See United States v. Reed*, 413 F.2d 338, 341 (10th Cir.1969), *cert. denied*, 397 U.S. 954, 90 S.Ct. 982, 25 L.Ed.2d 137 (1970); *United States v. Heliczer*, 373 F.2d 241, 249 (2d Cir.), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967).

These decisions and the Supreme Court's holding in *Wright & Wade* dovetail with

---

2. Section 1114, to which section 111 refers, has been modified twenty-six times since it was enacted in 1948. The majority of these amendments involved additions to the list of protected government employees. *See, e.g.,* Pub.L. No. 97–143, § 1(b), 95 Stat. 1724 (1981) (adding Capital Police); Pub.L. No. 85–568, § 304(d), 72 Stat. 434 (1958) (adding NASA employees). Other amendments reflected changes in the names of federal departments. *See, e.g.,* Pub.L. No. 93–481, § 5, 88 Stat. 1456 (1974) (substituting "Drug Enforcement Administration" for "Bureau of Narcotics and Dangerous Drugs").

In 1984, the statute was twice modified, Pub. L. No. 98–473, § 1012, 98 Stat. 2142 (1984); Pub.L. No. 98–557, § 17(c), 98 Stat. 2868 (1984). Neither amendment affects the defendant's case.

the goal of section 111. As the Supreme Court observed in *United States v. Feola,* 420 U.S. 671, 679, 95 S.Ct. 1255, 1261, 43 L.Ed.2d 541 (1975), Congress intended the provision not only to protect federal officers, but to safeguard "federal functions" as well. Reading section 111 to encompass Officer Abel's conduct here furthers that aim.

We are persuaded that the evidence in this case was adequate to permit the jury to find that Officer Abel was assigned to the DEA Task Force and, at the time of the assault, that he was acting in the performance of federal law enforcement duties. Therefore, Officer Abel fell within the ambit of those persons sheltered by section 111. Scienter is not an element of the 18 U.S.C. § 111 offense, *Feola,* 420 U.S. at 679, 95 S.Ct. at 1261; consequently, the defendant's apparent ignorance of the undercover officers' law enforcement identities does not undercut his conviction for assaulting a federal official. We will affirm the judgment on count 3.

## III. COUNTS 4 AND 5

### PREDICATE OFFENSES UNDER TITLE 18 U.S.C. § 924(c)(1)

 Defendant was also indicted on two counts under the firearm punishment enhancement statute, 18 U.S.C. § 924(c)(1) (Supp. IV 1986). This provision reads in pertinent part:

"Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...."

*Id.* Defendant was convicted on count 4 of using a firearm during a drug trafficking crime and on count 5 of using a firearm in assaulting a federal official.

For purposes of this provision, a "drug trafficking crime" is defined as "any felony violation of Federal law involving the distribution, manufacture, or importation of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." *Id.* § 924(c)(2). The Controlled Substances Act lists cocaine as one of the drugs subject to regulation, 21 U.S. C. § 812(c) (Schedule II) (a)(4) (Supp. IV 1986), and defines "distribute" as "to deliver (other than by administering or dispensing) a controlled substance," 21 U.S.C. § 802(11). Delivery, in turn, is defined as "the actual, constructive, or attempted transfer of a controlled substance." *Id.* § 802(8). Unauthorized distribution of controlled substances is prohibited by 21 U.S. C. § 841(a).

Defendant maintains that section 924(c)(1) authorizes prosecution only for the use of a firearm during the perpetration of a narcotics distribution, manufacture, or importation felony. However, in this case, he was convicted of conspiracy under the Controlled Substances Act, 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."). Defendant argues that Congress' failure to list conspiracy in its "drug trafficking crime" definition reflects its "lesser concern with conspiracies than with distributions and possessions with intent to distribute."

Defendant reads section 924(c)(1) too narrowly. By its terms, the provision applies to the use of a dangerous weapon *"during* and *in relation to* any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1) (Supp. IV 1986) (emphasis added). Moreover, the section extends broadly to "any felony violation of Federal law involving the distribution ... of any controlled substance." *Id.* § 924(c)(2). The felony definition is not confined to substantive offenses, but is limited only to felonies "involving" distribution. In two recent opinions, the United States Courts of Appeals for the Fourth and Eighth Circuits have relied on this expansive language to hold that section 924(c)(1) applies to crimes of possession, even though those offenses

are not expressly listed as "drug trafficking crimes" in the statute.

In *United States v. James*, 834 F.2d 92, 93 (4th Cir.1987), the Court of Appeals wrote, "we believe that violations 'involving' the distribution, manufacture, or importation of controlled substances must be read as including more than merely the crimes of distribution, manufacturing, and importation themselves." The Court commented that Congress designed the statute to discourage and punish the violence so often associated with drug trafficking. Consequently, in the Court's view, section 924(c)(1) ought not to be interpreted narrowly to exclude violence occurring during traffickers' attempts "to protect valuable narcotics supplies still in their possession or attempt[s] to stop law enforcement officials from disrupting intended transactions." *Id.*

Adopting a correspondingly comprehensive view of section 924, the Court of Appeals in *United States v. Matra*, 841 F.2d 837, 843 (8th Cir.1988), gave effect to "the plain language of this statute" and concluded that possession of cocaine with intent to distribute was clearly a crime "involving" the distribution of cocaine. *See United States v. Cruz*, 805 F.2d 1464, 1475 n. 12 (11th Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987); *United States v. LaGuardia*, 774 F.2d 317, 321 (8th Cir.1985).

In the crime of violence context as well, section 924(c)(1) has been read broadly to carry out its deterrent purpose. In *United States v. Moore*, 580 F.2d 360 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978), the Court affirmed the section 924(c)(1) conviction of a defendant charged with committing the predicate offense of attempted bank robbery. In that case, although the defendant—apprehended while walking toward the bank

—had no opportunity to brandish or discharge his concealed pistol, the Court held that he "used" the gun in the same manner that he had "used" a ski mask and gloves. "These items increased the likelihood of success; without them he probably would not have sallied forth." *Id.* at 362.

In *United States v. Gironda*, 758 F.2d 1201 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985), the defendants were convicted under section 924(c) of "carrying"[3] a gun during the commission of a felony, namely, conspiracy to steal money from a bank. The defendants were not arrested with the weapon in the vicinity of the bank, but were apprehended as they met at a local zoo. The Court of Appeals nevertheless affirmed the section 924(c) convictions, reasoning that the defendants could have been using the gun to pressure a reluctant accomplice to follow through in his role in the scheme. The Court cited floor statements by the statute's sponsor that the provision was intended "to persuade the man who is tempted to commit a Federal felony to leave his gun at home." *Id.* at 1214 (quoting 114 Cong.Rec. 22231 (1968)).

Interpreting section 924(c)(1) to encompass narcotics conspiracies is consistent with the legislative purpose. The statute originally provided enhanced penalties only for crimes of violence, but the 1986 amendment included the use of dangerous weapons in connection with drug crimes as well.[4] The Committee Report explained that the purpose of the legislation was "to enhance the ability of law enforcement to fight violent crime and narcotics trafficking" by providing "an important new weapon against narcotics traffickers." H.R.Rep. No. 495, 99th Cong., 2d Sess. 1, 2, *reprinted in* 1986 U.S. Code Cong. & Admin.News 1327, 1327, 1328.

---

**3.** Before 1984, section 924(c) contained two separate firearm prohibitions: "use" of a firearm to commit any felony, 18 U.S.C. § 924(c)(1), and "carrying" a firearm unlawfully during the commission of any felony, *id.* § 924(c)(2). In 1984, these two subsections were consolidated into the present "uses or carries a firearm" construction.

**4.** *See generally United States v. Cruz*, 805 F.2d 1464, 1474 (11th Cir.1986) (collecting pre-1986 cases struggling with question whether drug trafficking crimes were "crimes of violence"), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987).

To limit the Act to narcotics distribution crimes and thus exclude distribution conspiracies, is to arrive at an anomalous result Congress could not have intended. The Supreme Court has observed that "[f]or two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime." *United States v. Rabinowich*, 238 U.S. 78, 88, 35 S.Ct. 682, 685, 59 L.Ed. 1211 (1915). Such a criminal combination, the Court wrote, "is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered." *Id.*

Our readings of the statute and the opinions of the Courts of Appeals persuade us that a conspiracy to commit a felony under the Controlled Substance Act is a predicate offense within the scope of 18 U.S.C. § 924(c)(1), subjecting the conspirator to the mandatory enhanced penalties. Accordingly, we will affirm the conviction on count 4.[5]

Defendant does not argue that an assault on a federal official is beyond the scope of section 924(c)(1). We have no doubt that the defendant's assault with a carbine, in violation of section 111, was a "crime of violence" within the ambit of section 924(c)(1). The conviction on count 5, therefore, will also be affirmed.

## IV. REMAND FOR RESENTENCING

We have determined that the section 924(c)(1) convictions were proper under both counts 4 and 5. The government, however, has stipulated that only one sentence may be imposed in this case for violation of section 924(c)(1). In light of this concession, we will remand to the district court for resentencing. However, we will not ask the district court to elect between the two counts for the enhanced sentence. We recommend instead the imposition of a general sentence on both counts 4 and 5.

In *United States v. Gomez*, 593 F.2d 210, 214 (3d Cir.) (in banc), *cert. denied*, 441 U.S. 948, 99 S.Ct. 2172, 60 L.Ed.2d 1052 (1979), we held that, although the law allows separate and discrete offenses to be charged, it does not permit separate and discrete sentences to be imposed when Congress did not intend double punishment. *See Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958); *Prince v. United States*, 352 U.S. 322, 328, 77 S.Ct. 403, 406, 1 L.Ed.2d 370 (1957). The proper procedure is to impose a general sentence for a term not exceeding the maximum permissible sentence on the count that carries the greatest maximum sentence. *United States v. Corson*, 449 F.2d 544, 551 (3d Cir.1971) (in banc). *See United States v. Gomberg*, 715 F.2d 843, 851–52 (3d Cir.1983), *cert. denied*, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984), *Government of Virgin Islands v. Dowling*, 633 F.2d 660, 670 (3d Cir.), *cert. denied*, 449 U.S. 960, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980).

As explained in *Gomez*, "[f]ailure to permit the government to bring separate charges and obtain separate convictions on those charges, might enable a criminal defendant to avoid responsibility for his crimes if, on review, an appellate court reversed a single conviction representing only the most factually inclusive offense in a situation where a conviction on a less factually inclusive offense would have been upheld." *Gomez*, 593 F.2d at 213. *See Government of Virgin Islands v. Brathwaite*, 782 F.2d 399, 407–08 (3d Cir.1986); *Government of Virgin Islands v. Soto*, 718 F.2d 72, 75–76 (3d Cir.1983).

## V. SUMMARY

The convictions on counts 1, 3, 4, and 5 will be affirmed. The sentences on counts

---

**5.** After this case was argued, section 924(c)(1) was amended and now reads, "the term 'drug trafficking crime' means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.)." Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 6211, 44 Crim.L. Rptr. 3001, 3011 (Nov. 2, 1988).

4 and 5 will be vacated, and the case remanded for the imposition of a general sentence on those two counts.